(98 App. Div. 411)

DOWNEY et al. v. OWEN et al.

(Supreme Court, Appellate Division, Fourth Department. November 15, 1904.)

1. FOREIGN EXECUTORS—RIGHT TO SUE.

> A foreign executrix cannot sue here to recover property bequeathed by the will, but must be, appointed ancillary executrix, under Code Civ. Proc. § 2695.

2. EVIDENCE—TRANSACTION WITH DECEASED PERSON.

> In an action by administrators against the foreign executrix and a donee of testator to recover the subject of the gift on the ground of undue influence and incompetency, plaintiffs and the executrix made common cause against the donee. Testimony of one of plaintiffs as to a conversation between herself, deceased, and the executrix was admitted on the issue of incompetency, as against the executrix. *Held*, that as the evidence was only important as to the donee, and the witness incompetent to testify against him, admission of the evidence was error.

3. IRRELEVANT EVIDENCE—HARMFUL EFFECT.

> Where, on an issue as to mental competency at the time a gift was made, the court found that the donor was competent at a date when he executed a will prior to the time of the gift, but incompetent at the date of the gift, the erroneous admission of evidence of incompetency before the date of the will was harmful.

4. WITNESSES—COMPETENCY—ATTORNEY AND CLIENT.

> An attorney cannot testify against one claiming through a deceased client as to conversations and transactions with the client.

5. EVIDENCE—MENTAL CAPACITY.

> On an issue as to the mental capacity of a deceased donor at the time of a gift, evidence of a conversation with the donor's wife as to the donor's mental condition, and the subject of having an examination, was incompetent.

Appeal from Trial Term, Erie County.

Action by Alice M. Downey and another, as administratrix and administrator of the estate of Robert Drew, deceased, against Wil-

¶ 1. See Executors and Administrators, vol. 22, Cent. Dig. § 2330.

liam F. Owen and another. From a judgment for plaintiffs, defendant Owen appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Frank Brundage, for appellant.

Charles F. Tabor, David Miller, and E. M. Ashley, for respondents.

WILLIAMS, J. The judgment should be reversed as to the appellant and defendant, Owen, and a new trial ordered, with costs to appellant to abide event.

The action was in equity to set aside the transfer of moneys and mortgages made by the deceased, Robert Drew, to the defendant William E. Owen, and to recover the moneys and mortgages for the benefit of the estate. It was alleged that the transfers were obtained from the deceased while he was incompetent, and by fraud and undue influence. The defendant Cordelia B. Hester, or Drew, was made a party, and it was alleged that she conspired with the defendant Owen to keep the moneys and mortgages away from the plaintiffs and the persons lawfully entitled to the estate of the deceased; that she had, by fraud and undue influence, procured the deceased to make a will, under which she was the executrix and chief beneficiary, and had procured the same to be admitted to probate in the state of Kentucky, and herself to be appointed executrix; and that the moneys and mortgages were liable to come into her hands, and to be removed by her from this state. She answered in the case, alleging the will, the probate thereof in Kentucky, her appointment as executrix, and that the appointment of the plaintiffs as administrators was without jurisdiction, and asking that the complaint be dismissed.

Prior to or during the trial, however, an arrangement was made between the plaintiffs and Cordelia B. by which they were to make common cause against Owen, and they have since worked together pursuant to that arrangement, with the result that the trial court has found the will in favor of Cordelia B. a valid one, the deceased being competent to make the same; that he was a resident of Kentucky when he died, and the probate of the will in Kentucky was valid—and still has ordered judgment in favor of the plaintiffs herein for the recovery of the moneys and mortgages in controversy. If the transfer of this property to Owen was invalid, and the will in favor of Cordelia was valid and was properly probated in Kentucky, then this property passed under that will, subject to any debts owing by deceased in this state. The foreign executrix could not sue for them here, but she could be appointed ancillary executrix here under section 2695 of the Code of Civil Procedure, and then could maintain any action in this state necessary to protect the estate she represented in Kentucky. Very likely the appointment of the plaintiffs as administrators could not be attacked, collaterally in this action, and the court had power, notwithstanding its finding as to the will, to continue the action and grant the

relief it did. It would, however, have been more equitable, it seems to me, to have dismissed the complaint, and left the executrix to take her own proceedings against Owen, rather than award the relief to parties who were found to be really without any interest in the controversy.

Deceased resided with his first wife for many years on a farm in Newstead, Erie county, N. Y. They had two children, George H. Drew and Alice M. Downey. They removed to Middleport in 1874. George H. was then in Indiana, and Alice M. was married and lived in Middleport. Deceased lived with his first wife at Middleport until about 1879. He was engaged in buying horses for the New York market in Missouri, Kentucky, Michigan, and other Southern and Western states. He was away from home sometimes six months at once, and his family didn't always know where he was. He owned a farm in Kentucky in 1879. In 1881 he separated from his first wife, and commenced living with Cordelia B. as his wife in Kentucky. He claimed to have procured a divorce from this first wife in Indiana, and to have married Cordelia B. After that marriage his first wife brought an action against him in Niagara county for a divorce on the ground of adultery with Cordelia B., and deceased set up adultery on the part of his first wife, committed in 1872 and 1873. A trial was had in 1883, and the jury found both parties guilty of adultery. The first wife and children also procured deceased to be indicted for bigamy in the state of Indiana, by reason of his marriage with Cordelia B., and on his trial therefor he was acquitted. In both of these litigations Alice M. and her husband sided with the first wife, and aided her therein. Deceased had given his first wife large sums of money from time to time, and expressed himself freely as intending to give her nothing more. Deceased had loaned Alice M. and her husband money, and taken a mortgage therefor; and when he attempted to foreclose the mortgage they set up the defense of usury, which succeeded, and he lost his money. He expressed himself frequently as intending to give his daughter nothing more. He had also advanced to his son George many thousands of dollars in money and property, and had freely expressed himself as intending to give him nothing more. He was very friendly to Owen, and in the will he made in 1890 he gave his first wife nothing, his son and daughter $1 each, Owen and his father about $1,000 each, and the remainder of his estate to his second wife, Cordelia B. In 1890 and 1891 he gave his second wife, Cordelia B., several pieces of property, farms, mortgages, and large sums of money. About April 15, 1891, he transferred to Owen two mortgages he held against Owen's father—one for $3,633 and the other for $400—and in consideration thereof Owen gave deceased an agreement to furnish him all things necessary for his comfort and support during his natural life, if he should require it at any time; and the court held that the transfer of these mortgages was for a valuable consideration, and deceased was at that time competent. January 31, 1893, deceased wrote from his home in Kentucky to Owen, stating that he was sick, and asking Owen to come and take him to his (Owen's)

home in Newstead.   Owen accordingly went and brought deceased to Newstead, where they arrived February 12, 1903.   On the next day deceased and Owen went to Judge Miller's office in Lockport, and deceased there got from Miller a $9,000 note which he had for collection.   After leaving Miller's office, deceased left Owen, got a bottle of whisky, and when they started for home deceased was intoxicated, and when they got to Middleport he was drunk.   Owen left him at the hotel there, and went home.   Deceased remained at the hotel for some time.   While there, and on March 3, 1893, he made a transfer again of the $3,633 mortgage and of a $500 mortgage to Owen, and Owen gave him another agreement to care for him at his home, if desired, so long as he lived, and at his death to see that he was buried at Shelby Basin, N. Y., at his (decedent's) expense.   The agreement was signed by both deceased and Owen, and it provided that all debts up to the time of the death should be canceled between them.   March 4, 1893, deceased transferred to his second wife, Cordelia B., a note of $6,000, and three mortgages amounting to about $14,000—in all, $20,000.   After remaining at the Middleport hotel several weeks, the deceased went to Owen's house, where he stayed for a short time.   Then he returned to the hotel, and remained a short time, and then returned to Owen's house, and remained there until he died, on the 29th of April, 1893.   About a month before his death, and at Owen's home, deceased gave Owen certificates of deposit, drafts, United States bonds, and checks for deposits in savings banks, and money, amounting in all to about $17,500.   At the time of his death deceased was 76 years old, and his two children were 40 to 50 years of age.   His first wife died in 1897.   The court found the transfers of the mortgages in 1891 to Owen—one of $3,633 and the other of $400—were valid, but the transfer of the mortgage of $500, March 3, 1893, and the gift of the certificates, etc., for $17,500, were invalid, because without consideration and made while deceased was of unsound mind.

Evidence was given by both parties as to the various transactions in which deceased was engaged from the time he left Kentucky and came with Owen to the state of New York, February 12, 1893, until his death, April 29, 1893, and as to his physical and mental condition during that time.   All this evidence related directly to the question in controversy, and was for the consideration of the court.

Whether the deceased in fact made a gift of the certificates, etc., to Owen a month before the death, was controverted; but the court found the gift, in fact, made, and based its finding of the invalidity of the gift and of the transfer of the $500 mortgage March 3, 1893, solely upon the incompetency of the deceased.

In addition to the foregoing evidence on the question of competency, there was the consideration as to real intention of deceased as to the disposition of his property.   While he was entirely competent, he expressed very clearly his desire that his first wife and children should have none of his property.   We have already referred to his reasons therefor, and they were entirely adequate.   While he was entirely competent he made the will of 1890, in which his second wife was the chief beneficiary, and at various times thereafter, prior to February 13,

1893, when he came with Owen to New York, he gave his said second wife farms, mortgages, and large sums of money, making very liberal provision for her. And so late as March 4, 1893, he gave her $20,-000 of notes and mortgages at one time.

Now, considering this condition of things, it was very reasonable that deceased should make these latter gifts to Owen. The evidence shows a great friendship between them. When he was sick and likely to die he left his home and wife in Kentucky, and came and stayed with Owen until his death. Out of so large an estate, a comparatively small amount had theretofore been given him. Who should be heard to object to these gifts? Not the first wife and children, because, concededly, all their rights had been cut off by the will, and the deceased intended that they should be cut off. No one but the second wife could be heard to object. If Owen did not keep this property, it would go to her. She has been well taken care of, and should not have this property in addition to all she has had otherwise from the deceased and his estate. This property belonged to the deceased. He had the right to do with it as he saw fit, and the conclusion is irresistible that he did with it just what he wished to do.

But the court has found, on all the evidence, that from the time deceased came to New York in February, 1893, or certainly from March 1st until his death, he was incompetent to do business, and therefore this gift and the transfer of the $500 mortgage was invalid; and it is claimed we ought not to reverse the court upon the fact and finding as to competency.

A large amount of evidence was given by the parties with reference to the mental condition of deceased for many years prior to 1890 and 1891, but the court held that deceased was competent to make the will in May, 1890, and to transfer the two mortgages to Owen in April, 1891. The court did not find incompetency back of March 1, 1893, and there is no ground for saying there was any want of mental capacity prior to that time. After that deceased was sick and drank more or less, and the finding of incompetency must have been based upon his then condition of body and mind, and not upon any condition theretofore existing. I have been over the evidence given on either side as to this question of competency during the last two months deceased lived, and when these gifts and transfers were made. I do not like this finding upon which the decision was based. I think the finding should have been that the deceased was competent to make the gifts and transfers, and that the complaint should have been dismissed upon the merits. There are some exceptions, moreover, that call for a reversal of the judgment.

The deceased's daughter Mrs. Downey, one of the plaintiff administrators, was permitted to testify to personal communications with her father, the deceased, over the objection of defendant, based on section 829 of the Code of Civil Procedure. She went to the hotel at Middleport while deceased was there sick in bed, some time during the last two months of his life, and talked with him, and she went a second time and had another interview. The second wife, Cordelia B., was present some of the time during these interviews. The daughter was allowed, as a witness, to state what was

done and said at these interviews. The court stated that the evidence was admitted against the defendant Cordelia B., and not Owen. It was very important evidence, however, bearing upon deceased's mental condition, and the influence that was being exerted upon him, as claimed, by Cordelia B. It was stated by counsel at the time the ruling was made, as it clearly appears now, that no issue was being tried between plaintiffs and Cordelia B. They were working together, and the evidence could only be important as against Owen, and may very well have influenced the court in its final decision. If it was not important upon the issue against Owen, it should not have been taken in the case. Cordelia B.'s counsel did not object to it. It got into the case through the joint action of the plaintiffs and Cordelia B., and was erroneously received. Nothing was held in Marten v. Hillen, 142 N. Y. 140, 36 N. E. 803, or McLaughlin v. Webster, 141 N. Y. 85, 35 N. E. 1081, that implies this witness was competent under section 829 of the Code of Civil Procedure. This evidence was given by an administrator, but she was also interested in the event of the action, and Owen was a party claiming by, through, and under the deceased. Such was not the case in the citations just made.

The witness Tefft, an attorney, was permitted to relate conversations and transactions with deceased occurring prior to March 1, 1893, under the objection that they were privileged, being between an attorney and his client, and letters were read in evidence that had passed between them. This was erroneous.

It is said that the court having based its decision upon incompetency after March 1, 1893, alone, this evidence was not prejudicial to the defendant Owen. It was retained in the case, however, and we cannot say that the evidence relating to deceased's condition prior to March 1, 1893, may not have had some influence upon the court in determining the effect to be given to the evidence of the sale and conversations of the deceased during the last two months of his life.

The evidence of the witness Miller, an attorney, and the attorney for Cordelia B. in this case, as to the transactions and conversations between him and deceased February 24, 1893, while the relations of attorney and client existed between them, was inadmissible, and should not have been received over the objection of the defendant Owen. This was very important evidence, and must have had serious effect upon the court in the determination of the fact of incompetency.

The witness Coon was permitted to give evidence that there was a conversation with the defendant Cordelia B. as to the mental condition of the deceased, and the subject of having an examination. This was improper, though perhaps not very important.

It seems to us, justice requires the judgments to be reversed as to defendant and appellant Owen, and a new trial granted, as hereinbefore indicated.

Judgments reversed upon the law and the facts as to the defendant and appellant Owen, and a new trial ordered as to such defendant, with costs to said appellant to abide event. All concur; SPRING and STOVER, JJ., in result.